IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MELANIE SHANNON, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3034 |
| | ) | |
| V. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM AND ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Melanie Shannon ("Shannon") seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act and for the payment of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the Commissioner's decision will be reversed and remanded for further consideration.

## I.  PROCEDURAL BACKGROUND

Shannon applied for social security disability benefits on March 22, 2005, claiming disorders of her muscles, ligaments, and fascia, obesity, and a history of Hepatitis C infection rendered her disabled and unable to work since December 1, 2003.  Social Security Transcript ("TR") at 26.  Specifically, she claimed she was disabled due to Hepatitis C, bipolar disorder, bronchitis, "female problems," pain in her hips, feet, and back, and polycystic disease.  TR 91.  Her application for disability benefits was denied on June 8, 2005, (TR 255-59).

Shannon filed a hearing request on June 24, 2005.  TR 44.  A hearing was held before an Administrative Law Judge ("ALJ") on November 5, 2007, and testimony was received from Shannon and a vocational expert ("VE") who appeared at the ALJ's request.  TR 260-289.  Shannon waived her right to counsel and was not represented at the hearing.  TR 27, 263.

The ALJ's adverse decision was issued on December 10, 2007, (TR 10-21), and Shannon's request for review by the Appeals Council was denied on December 8, 2008.  TR 9.  Shannon is now represented by counsel, and her pending complaint for judicial review and reversal of the Commissioner's decision was filed on March 27, 2009.  Filing No. 1.

## II.   THE ALJ'S DECISION.

The ALJ evaluated Shannon's claims through the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920, (TR 82-90), and found:

1.   Shannon met the insured status requirements of the Social Security Act through December 31, 2006, but not thereafter.

2.   Shannon did not engage in substantial gainful activity at any time relevant to the ALJ's decision.

3.   Shannon has the following severe impairments: a history of polycystic kidney disease and hepatitis C; a history of a bipolar disorder; low back pain; and obesity.

4.   Shannon does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Based on the entire record, Shannon has the residual functional capacity to lift and carry up to 10 pounds; is limited to a 2- to 3-hour workday; can sit for 5 to 6 hours a day; and can occasionally climb, balance, stoop, kneel, crouch, and crawl.  However, Shannon cannot work on ladders or scaffolds; she needs to avoid concentrated exposure to vibrations, fumes and hazards; she needs routine, repetitive work which does not require the setting of goals or dealing with change; and she must be limited to brief, superficial contact with the general public, co-workers, and supervisors.

6.    Shannon is unable to perform her past relevant work.

7.    Shannon was born on November 1, 1962 and was 38 years old on the alleged disability onset date, which is deemed to be a younger individual under C.F.R. 404.1563 and 416.964.

8.    Shannon completed her GED and is able to communicate in English.

9.    Transferability of job skills is not an issue in this case because Shannon's past relevant work was unskilled.

10.   Considering her age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy which Shannon can perform.

TR 15-19.

III.   ISSUES RAISED FOR JUDICIAL REVIEW.

Shannon claims the ALJ's decision was incorrect for the following reasons:

1.     The DOT descriptions for the three jobs proposed by the VE at the hearing exceed Shannon's residual functional capacity ("RFC").

2.     There is no substantial evidence supporting a finding that performing a 2- to 3-hour workday would result in substantial gainful employment.

3.     The ALJ misinterpreted the global assessment of functioning ("GAF") scores of the consulting psychologists.

4.     The ALJ failed to develop Shannon's medical and work record.

5.     The RFC determination used by the vocational witness was not supported by substantial evidence of record, resulting in a legally defective hypothetical question.

6.     The ALJ improperly discounted Shannon's credibility.

Filing No. 18.

IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of November 5, 2007, the date of the social security hearing, Shannon was forty-five years old, with a seventh or eighth grade education, and cared for her disabled husband at home. TR 266-68. Shannon explained her husband has end-stage renal disease and receives daily dialysis. Shannon dropped out of school in the eighth grade because she was rebellious and had problems with depression and suicidal ideation, (TR 214, 266-67), but she earned her GED in 1991. Shannon can speak, read, and understand English, but has some difficulty with reading comprehension. TR 70, 214.

-4-

Shannon's previous employment experience included working in various restaurant cook positions making sandwiches (e.g., Wendy's, Subway, etc.), but she never held any job for more than six months. She was not employed before 1997, or after June of 2003. TR 53-55, 75, 216, 269, 272. Shannon testified she did not work before 1997 due to overwhelming depression and suicidal ideation. TR 270. At the social security hearing, Shannon testified about depression and behavioral problems dating back to childhood and adolescence. TR 267.

On April 7, 2005, medical record requests were sent to medical providers identified by Shannon. For two of the providers, St. Francis Hospital in Memphis, Tennessee and Richard Young Hospital in Kearney, Nebraska ("Richard Young"), records were requested for the time frame beginning in April 2000 and continuing to present. St. Francis and Richard Young produced no documents, explaining they had no record of treating Shannon during the identified time frame. TR 94-95, 255.

On September 13, 2001, Shannon was seen at the Greenwood Leflore Hospital in Greenwood, Mississippi. She reported having dark-colored urine and back pain for four days; rectal bleeding, with a past history of intermittent occurrences for the past two years; and a past history of Hepatitis C infection, first diagnosed in 1993. Upon examination, blood was detected in her urine and stool specimens. She was diagnosed with hemorrhagic cystitis,[1] and hematochezia.[2] Shannon was prescribed a broad-spectrum antibiotic (Levaquin), discharged from the emergency room in good

---

[1]Hemorrhagic cystitis is defined as an infectious or noninfectious process that leads to blood in the urine originating from an inflammation in the urinary bladder. http://emedicine.medscape.com/article/442190-overview. A culture performed on urine collected on September 13, 2001 later confirmed an Escherichia coli (E. Coli) infection. TR 140.

[2]Hematochezia is defined as "[b]right red blood in the stool, usually from the lower gastrointestinal tract -- the colon or rectum -- or from hemorrhoids." http://www.medterms.com/script/main/art.asp?articlekey=18453.

condition, and referred to a local physician for followup. TR 132, 135. She did not begin taking the Levaquin until the night of September 15, 2001. TR 140.

Shannon returned to the Greenwood Leflore emergency department on September 16, 2001 at 4:15 a.m., complaining of a sense of urinary urgency, but an inability to urinate for the past 24 hours. Shannon reported a 22-year past history of polycystic kidney disease, and stated her mother died of polycystic kidney disease and colon cancer. Her past medical history included a hysterectomy (removal of the uterus) in 1987, oophorectomy (removal of ovaries), a rectocele surgery (repair of rectal prolapse) in 1990, and cystocele repairs (bladder suspension surgeries) in 1990 and 1992. Shannon was admitted to the hospital for a urinary tract infection and possible acute renal failure secondary to rhabdomyolysis,[3] and polycystic kidney disease.[4] TR 138, 140, 154, 220. The E.Coli strain causing Shannon's infection was sensitive to Levaquin, she began to recover, and was told to continue taking the medication. TR 142. A CT scan was performed and confirmed the presence of polycystic kidney disease, with cysts present in both kidneys and in the liver, but not in the pancreas. TR 151. A colonoscopy was also performed and, with the exception of moderate internal non-bleeding hemorrhoids, was considered normal. TR 143. Shannon was released from the hospital on September 21, 2001 with normal renal function. TR 144.

Shannon returned to the Greenwood Leflore emergency department a year later, on September 19, 2002, this time complaining of shortness of breath and chest

---

[3]"Rhabdomyolysis is the breakdown of muscle fibers resulting in the release of muscle fiber contents (myoglobin) into the bloodstream. Some of these are harmful to the kidney and frequently result in kidney damage." http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm.

[4]"Polycystic kidney disease (PKD) is a genetic disorder characterized by the growth of numerous cysts in the kidneys.... PKD cysts can profoundly enlarge, . . . resulting in reduced kidney function and leading to kidney failure." http://kidney.niddk.nih.gov/kudiseases/pubs/polycystic/.

pressure for the last 12 to 18 hours, fever and chills for two days, and excessive weight gain over the last six months.   Shannon was admitted to the hospital, and released two days later after testing ruled out myocardial infarction.  TR 154-170.

Shannon moved from Tennessee to North Platte, Nebraska, and she lived in North Platte until December 2006.  Her primary North Platte physician was Dan Nguyen, M.D.  TR 274.  The treatment records from Dr. Nguyen indicate Shannon sought care for bronchitis, head congestion, back pain, and headaches.  TR 206-212. Shannon was admitted to the Great Plains RMC in late November 2003 with complaints of shortness of breath, and persistent coughing, and ultimately a diagnosis of influenza and perhaps some "patchy pneumonia."  TR 181-200, 211.  She was seen in the Great Plains RMC emergency department on August 3, 2004 for complaints of low back pain, flank pain, and pain and urgency with urination.  TR 172-180.  In addition to the past history described on admission to the Greenwood Leflore Hospital, she now also reported having borderline diabetes.[5]  Shannon was diagnosed with kidney infection, (pyelonephritis), prescribed Levaquin, and at her request, was discharged to care for her terminally ill husband.  TR 173-74.

Shannon was seen by a gynecologist and urologist in the spring of 2005 for complaints of flagrant urinary incontinence.  According to the urology report dated May 14, 2005:

> UROLOGICALLY:   She has major difficulties here. Her stream is hesitant starting.  She has to put two fingers in her vagina in order to release the bladder to be able to void.  Her stream is intermittent.  She never feels empty when she voids.  She always dribbles at the end of the stream and she feels that there is a residual left behind.  She is up two or three times at night and voids every hour and a half during the day.  She

---

[5]Shannon's blood glucose testing was consistently within normal range, and her urine glucose was consistently negative.  TR 134-35, 145-47, 160.

> leaks with cough, laughing, standing, sitting or at other times.  Leakage
> can be unpredictable.  She has polycystic kidney disease, history of
> blood in the urine.  A history of kidney stones.

TR 203-204.   Sacrocolpopexy surgery with a subsequent sling procedure was recommended to manage Shannon's recurrent prolapse and incontinence, but Shannon lacked insurance and her Medicaid coverage was about to expire.  TR 202, 205.  Shannon was covered by Medicaid until June of 2005, when her youngest daughter turned eighteen.  TR 273-74.  In June 2005, Shannon was living in North Platte, Nebraska.  She moved to Kearney, Nebraska in December of 2006.  TR 272-73.

While still on Medicaid, Shannon sought no treatment for depression or mental health problems, (TR 281), and she sought no treatment for medical or mental health problems after losing her Medicaid benefits, including from any low cost or free clinics in North Platte, or in the Grand Island or Kearney area.  TR 265.  Once her Medicaid benefits were lost, she used over-the-counter medications to treat her symptoms.  TR 265.

Shannon was evaluated by a consulting psychologist, Lisa Jones, Ph.D., on May 3, 2005.  She drove herself to the appointment.  TR 213.  Shannon told Dr. Jones there were periods of time where she could not get out of bed for up to five days in a row, and stated she isolates herself, has difficulty maintaining social functioning, and has increased thoughts of suicide when stressed.  TR 219.  During the consultation, Shannon appeared well-oriented and alert, with no reported hallucinations, normal remote memory, and fair judgment.  However, she was depressed, her recent memory seemed moderately impaired, she was ruminative with some disorganization of thought and loss of insight, and she described experiencing some types of flashbacks.  Her GAF was 50, with 60 being the highest GAF level over the past year.  TR 217.

The psychologist concluded Shannon has a substantial mental health problem, including a diagnosis of Bipolar I and anxiety disorders, but remains able to concentrate and complete tasks, understand and remember short and simple instructions and to carry them out under ordinary supervision, relate appropriately with coworkers and supervisors, and adapt to changes in her environment.  TR 217-219.

A mental residual functional capacity ("RFC") assessment was completed on June 7, 2005, based on Dr. Jones' psychological examination of Shannon and a review of Shannon's records.  The mental RFC evaluator, Patricia Newman, Ph.D., concluded Shannon has a moderately limited ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; work with and in proximity to others without causing a distraction or being distracted; complete a normal workday and workweek without being interrupted by psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.   Dr. Newman further concluded Shannon had no significant limitations in ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; make simple work-related decisions; perform activities within a schedule, maintain regular attendance, be punctual, and sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions and request assistance; maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness; and set realistic goals or make plans independently of others. TR 110-11. Dr. Newman explained:

> [Shannon] is able to care for her daily needs, does household chores and takes care of [her] husband.  It is reported that she cannot handle all the inside chores and she has help at this time.  She does no outside type chores.  She drives a car, goes to grocery, pays her bills online.  She

handles her own money, but not too well.  She does not like a lot of company as she cannot deal with all the activity and confusion.

. . .

She is able to care of herself and take care of an impaired spouse at this time. [Shannon] is capable of doing simple unskilled work that does not require a great amount of public contact.

TR 114-15.  See also, TR 61-65 (interrogatory responses).

Shannon was evaluated by a medical consultant, Leland F. Lamberty, M.D., on May 24, 2005.  She complained of pain in the mid back, low back, hips, knees and feet, and foot and ankle swelling, particularly when she is walking or standing for long periods of time.  She believed her mid and low back pain was caused by her large breasts, and her low back pain was also due to persistently lifting her disabled husband.  She did not complain of joint discomfort and was not taking any anti-inflammatory medications.

Upon examination, the consulting doctor noted:

BACK AND SPINE :

Tender over the upper and mid thoracic spine area and associated paraspinous muscles and tender over the entire low back area.  Range of motion of the back, however, is extremely good and done without significant difficulty.

EXTREMITIES:    No edema or deformity.    Range of motion is excellent upper and lower extremities.  Pedal pulses not palpable.

NEUROLOGIC:

Cranial nerves II through XII intact.  No motor or sensory deficits noted. Reflexes 3+ and equal.

> Bilateral hip x-rays showed no significant degenerative change or other abnormality. Lumbar spine x-ray shows slight loss of the normal lordotic curve, but disk spaces are well maintained and there is no evidence of compression fracture or other degenerative change.

TR 222-23.  Dr. Lamberty found Shannon had chronic pain in her mid back, low back, hips, knees and ankles, and a history of Hepatitis C infection, polycystic kidney disease, recurrent urethral calculi, long-term tobacco abuse, and bipolar disease.  He concluded:

> [Shannon's] primary problems are related to her chronic joint pain. Other than tenderness on exam and her being significantly overweight, there are no positive findings on examination or x-ray.  The fact that she does significant amount of lifting trying to care for her husband probably plays a large role based on the complaint of pain, her size and her current stressful situation it would be very difficult for her to do heavy manual labor, which would involve significant bending, squatting, lifting, twisting or anything requiring her to be on her feet for an extended period of time.

TR 223.

A physical RFC assessment based on Dr. Lamberty's examination of Shannon, and a review of Shannon's records, was completed on June 8, 2005.  The physical RFC evaluator noted "a lack of positive medical evidence as far as x-rays to identify a severe condition w/ hips/back."  TR 121.  The evaluator nonetheless limited Shannon to light work, finding she could occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand, walk, or sit with normal breaks for a total of 6 hours in an 8-hour workday; occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, and could frequently balance; had no manipulation, vision, communication, or environmental limitations, other than she must avoid vibration, fumes, and work hazards such as machinery or heights.  The physical RFC evaluator

imposed no restrictions based on Shannon's history of Hepatitis C infection because there was nothing of record indicating recent symptoms, and nothing indicating Hepatitis C limited her ability to function.   TR 116-123.

Shannon's application for disability benefits was denied on June 8, 2005,  TR 255-59.  Shannon requested a hearing before an ALJ on June 30, 2005.  Her hearing request stated:

> I am not able to work.  I am becoming less able to even take care of my dying husband.  I think more and more about suicide. (Daily) I am having days that I cannot even get out of bed.  And I know that I can not even clean my own house.

TR 44.

Approximately two years later, just prior to her scheduled social security hearing, Shannon underwent new mental and physical examinations.  Shannon was evaluated in her home by a licensed psychologist, Brad Bigelow, Ph.D. on August 8, 2007.  Shannon's activities of daily living remained essentially unchanged from those described to Drs. Jones and Lamberty in 2005.  She was still caring for her husband, driving, grocery shopping, handling the family finances, and performing light cleaning in the home.  However, she was reportedly not lifting more than five pounds, her weight had increased, and she was using a cane when walking. She described emotional breakdowns and crying uncontrollably when she tried to return to work, and stated she "experiences periods of depression, where she is quick to anger, slamming doors, rolling her chair into a cabinet, not answering the phone or the door[,] isolating herself and remaining in bed for a couple of days."  TR 229.  See also, TR 77-84 (Shannon interrogatory responses).  Regarding mental acuity, Dr. Bigelow noted:

> [Shannon] is oriented x's 3, maintaining good eye contact with adequate powers of concentration and attention.  Memory - both remote and

recent - is relatively intact and [she is] considered to be a reliable historian.   Speech rate was slow, with thought process and verbalizations generally logical and goal-directed.  Melanie denied any symptoms of a thought disorder including hallucinations and delusions.  She also disclaims any suicidal/homicidal thoughts or plan. Insights and judgment are adequate.  Mood is mildly dysphoric and affect somewhat subdued although Melanie did engage in spontaneous dialogue.  She acknowledges a slowness to trust others.

TR 228. Dr. Bigelow diagnosed Shannon as having "Bipolar I Disorder, Most Recent Episode Depressed with Paranoid Trends," with a GAF of 50.  TR 228.   Dr. Bigelow's Medical Source Statement, dated August 13, 2007, concludes Shannon's mental impairment does not or only minimally limits her ability to understand, remember, and complete instructions, but based on Shannon's self-reports, markedly limits her ability to interact appropriately with the public, supervisors, and co-workers, and moderately limits her ability to respond appropriately to situations at work and changes in the routine work setting.  TR 230-31.

Ron D. Scott, M. D. performed a physical examination of Shannon on August 16, 2007.   Shannon complained of significant, persistent, and daily low back pain that averaged 3 to 6 on a 10-point pain scale, and claimed this pain was present during all waking hours, and wakes her five or six times a night.  She stated she can walk only a block and needs a cane; even with a handrail, can climb only three steps; can descend only six steps before being limited by knee pain; can sit for only 20 minutes and stand for only 30 minutes at a time; has increased pain with laughing, coughing, and bowel movements; is unable to bowl, hike, bike, or swim; and has difficulty with intercourse.  Shannon stated she could lift only perhaps a pound from the floor to her waist, 10 pounds from her waist to her chest, and nothing above shoulder height.  TR 233.

Dr. Scott's findings on examination of Shannon's extremities, recited in total below, stated:

-13-

She has a reduction of range of motion with forward flexion. Straight leg raising is positive on the right at about 5 degrees when the claimant is laying supine but she has no pain going down her leg, there is only pain in the back, and at 15 degrees she has pain going down her back, none down her leg. However, when she sits she can raise her right leg 85 degrees and 90 degrees on the left. Deep tendon reflexes are normal active bilaterally and she has good strength of dorsiflexion of her great toe bilaterally. She does have difficulty getting up from a chair and climbing up to my exam table. She has pain when she goes from a sitting position to a supine position and has difficulty sitting up. However, she does not roll to her side to sit up. I was able to watch her walk down my hall and she would favor her right leg in that she steps out with the left and then seems to place the right leg. She does not have any foot drop. Her pace was somewhat slower and her stride was attenuated when she walked down my hall. She did use a cane on the right side. She had no difficulty opening the door to go into my waiting room while walking down the hall.

TR 236. Dr. Scott diagnosed Shannon as having mechanical low back pain with possible sciatica, obesity, tobacco abuse, and a history of polycystic kidney disease, hepatitis, diabetes, bipolar personality, hysterectomy, bilateral salpingo-oophorectomy, and rectocele and cystocele repairs. Contrary to Shannon's belief, Dr. Scott concluded Shannon's back pain was not related to her history of kidney disease. TR 236-37.

Although Dr. Scott's record contains no patient history regarding activities performed by Shannon in her home, and his extremity examination and ultimate diagnosis mentions nothing about Shannon's arms and shoulders, Dr. Scott's Medical Source Statement dated August 17, 2007 states Shannon can never lift or carry any weight; cannot use either hand to reach, push, or pull; and can use her right hand only occasionally to handle, finger, or feel. Incongruously, the same report states Shannon can carry small objects in her hands while walking provided she is not using a cane. Based on the Dr. Scott's Medical Source Statement, Shannon can sit or walk only 15

-14-

to 20 minutes at a time, and can stand for only 30 minutes at a time; and she can sit for a total of five hours, stand for a total of two hours, and walk for a total of one hour in an eight-hour workday.  Dr. Scott concluded Shannon can ambulate only 50 feet without a cane; can occasionally use her right foot and frequently use her left foot to operate foot controls; can never climb stairs, ramps, ladders or scaffolds; and can never balance, stoop, kneel, crouch, or crawl.  She can only occasionally operate a motor vehicle, but she can perform shopping activities, walk a block at a reasonable pace on rough and uneven surfaces if she uses a cane, climb a few steps if she uses a handrail, prepare simple meals, care for her personal hygiene, and sort, handle or use paper files provided she does not stoop.  TR 241-246.

In September 2007, Shannon and her father drove to Tennessee with Shannon's husband.  Shannon and her father alternated driving, stopping every hundred miles to take a 20- to 30-minute break.  TR 276.  Shannon had a kidney stone attack while in Tennessee and was seen at the emergency department of a hospital in Camden, Tennessee.

The social security hearing was held on November 5, 2007.  Shannon was reminded she could appear through counsel, but she chose to represent herself.  TR 263.  Shannon testified she cannot work due to back pain, leg pain, inability to bend or stoop, inability to lift and carry with her arms, insomnia, and severe depression.  TR 276-77, 280.  Her past employment included working as a cook making sandwiches.  TR 54, 85.  However, at the time of the hearing she was her husband's caregiver. Shannon explained her husband cannot be left unsupervised due to mental incompetency, and cannot accompany Shannon out of the house because he lacks an immune system.  TR 278-79.

Upon evaluation of Shannon's work history, the ALJ concluded Shannon's only substantial gainful activity was her work at Subway making sandwiches.  TR 283.  The VE testified a sandwich maker in a deli is "very, very similar in terms of

-15-

restrictions" to a sandwich maker in a fast food restaurant setting. ( TR 283), both being characterized as light, unskilled (SVP 2) positions.  TR 283.  There is no description of a sandwich maker in the Dictionary of Occupational Titles (DOT), but the VE testified a cook helper or fast food worker position, DOT.472-010, would be similar to a deli sandwich maker.

The ALJ asked the VE to assume Shannon needs light, unskilled, repetitive work.  Consistent with the physical and mental RFCs completed in 2005, the VE was asked to assume Shannon must avoid jobs which require goal setting, dealing with job changes, and having more than brief, superficial interaction with the public, co-workers and supervisors.  The ALJ asked the VE to further assume Shannon can occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand, walk, or sit 6 hours in a 8-hour workday; occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, and could frequently balance; and other than avoiding vibration, fumes, and work hazards such as machinery or heights, lacked manipulation, vision, communication, or environmental limitations.   TR 284.  Assuming the foregoing restrictions and limitations, the VE testified Shannon could return to her past work as a sandwich maker, with 2879 "combined food preparation and serving worker, including fast food" jobs in Nebraska and 8000 such jobs in the four-state region including Iowa, Nebraska, Missouri and Kansas.   The VE further testified  that assuming Shannon could perform light, unskilled, repetitive work, she could perform the full range of light, unskilled positions.  TR 285.

However, the VE testified that if Shannon was limited to performing sedentary jobs, and was limited to standing or walking only two or three hours a day and sitting five or six hours a day, she could not perform her past work.  The VE testified Shannon would, however, remain able to perform sedentary, unskilled jobs such as an unskilled office helper (DOT 239.567-010), with less than 1000 unskilled office helper jobs in Nebraska, 2802 in the four-state region, and 63,480 such jobs nationwide.  In addition, the VE testified Shannon could perform a sedentary,

-16-

unskilled job as a production assembler (706.687-010), with 183 such jobs in the four-state region, or a sedentary, unskilled hand packager job (DOT 920.587-018), with 647 such jobs in the four-state region.  TR 286.

Finally, if Shannon's described symptoms were found credible, the VE testified Shannon would be unemployable because of her inability to maintain consistency in work settings.  Specifically, there are no jobs that permit employees to take three days off without notice because the employee claims to have symptoms which hinder her ability to get out of bed.  TR 288.

## V.  SUPPLEMENTAL RECORDS ON JUDICIAL REVIEW

Shannon has submitted supplemental records for the court to consider on judicial review, (see filing no. 19), and claims this case must be remanded because the ALJ failed to adequately develop the record. An ALJ has the duty to develop the record independent of the claimant's burden in the case.  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004).  There is no bright line test for determining when the ALJ has failed to adequately develop the record.  The determination must be made on a case by case basis.  Battles v. Shalala, 36 F.3d 43, 45 (8th Cir.1994).

Upon judicial review of an ALJ's decision, "[a] disability claimant who wishes to add evidence to the record must show that the evidence is new, that it is material, and that 'there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" 42 U.S.C. § 405(g). Chandler v. Secretary of Health and Human Services, 722 F.2d 369, 371 (8th Cir. 1983).  A claimant's lack of counsel during the administrative proceedings may constitute cause.  Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988).  The mere lack of counsel does not alone deprive a claimant of a fair hearing, but it does enhance the ALJ's duty to bring out the relevant facts.  Phelan, 846 F.2d at 481.  However, an ALJ's decision will not be reversed for failing to obtain and review medical records absent some showing of prejudice caused

by the lack of records.   Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir.1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial."); Phelan, 846 F.2d at 481 ("Absent unfairness or prejudice this court will not remand for further proceedings.").

Prejudice arises when medical records material to the outcome of the claim were not collected and reviewed by the ALJ.  "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993) (quoting Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir.1984)).

The court may consider additional records on judicial review to determine whether the case must be remanded because the ALJs alleged failure to develop the record was prejudicial to the plaintiff's claim.  See, e.g., Halverson v. Astrue, 2010 WL 1253736 (8th Cir. April 2, 2010) (indicating both the district and circuit courts reviewed the claimant's long-term disability insurance claim file to determine if the claimant was prejudiced by the ALJ's failure to consider these records); Woolf, 3 F.3d at 1215 (discussing a letter that the plaintiff hoped to have considered as new evidence and finding that there was not a reasonable likelihood that it would change the determination of no disability).  See also, Nelms v. Astrue, 553 F.3d 1093, 1099 n. 1 (7th Cir. 2009) (noting that the claimant submitted additional evidence on review to "establish that the ALJ did not fulfill his duty to create a fair and full record").

As part of her record on appeal to this forum, Shannon has filed medical records from Great Plains Regional Medical Center (Great Plains RMC) for the time period from October 14, 1991 through March 29, 1994, and records from Richard Young Hospital dated January 23, 1992. See filing no. 19.  These records reveal Shannon was

hospitalized at Great Plains RMC in North, Platte, Nebraska between 1991 and 1993 for suicide attempts and/or thoughts, and was diagnosed with "atypical bipolar affective disorder" on October 18, 1991, (filing no. 19, at CM/ECF p. 9), and "bipolar disorder, depressed" on April 22, 1993, (filing no. 19, at CM/ECF p. 16). She was admitted to Richard Young on January 23, 1992 for emergency protective custody, (filing no. 19, at CM/ECF pp. 37-43), and upon discharge, was diagnosed as having "Dysthymia," and "Personality Disorder, Not Otherwise Specified with Dependent and Passive Aggressive Features." Filing No. 19, at CM/ECF p. 37. Shannon's supplemental records indicate she discharged herself against medical advice from her mental health hospitalizations at Great Plains RMC from 1991 through 1993, and from Richard Young in 1992. Filing No. 19, at CM/ECF p. 4, 7, 10, 17, 38.

## VI.  ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may

not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010).

> A.      Assessment of Shannon's Impairments–Unsupported or Incomplete Hypothetical Question.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). Before the ALJ determines an applicant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC." Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."). An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that she has properly rejected as untrue or unsubstantiated." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

> 1.      Failure to Properly Assess Shannon's Credibility.

The ALJ concluded Shannon's statements concerning the intensity. duration and limiting effects of her symptoms were not entirely credible. To assess a claimant's credibility, the ALJ must consider all the evidence, including: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009). The ALJ is not required to discuss methodically each of these factors, so long as the ALJ acknowledges those considerations before discounting the subjective complaints. However, an ALJ who rejects  subjective

complaints must make an express credibility determination which explains the reasons for discrediting the claimant's complaints.  Id.

The ALJ's decision states, "The undersigned does not find the claimant to be credible and she appears to exaggerate her symptoms."  TR 19.  In support of his conclusion, the ALJ's decision notes that although Shannon complained of mental health symptoms dating back to childhood, and physical symptoms dating back to at least 2001, she sought very little medical and mental health care for these symptoms, including prior to June 2005 when she was still receiving Medicaid.  As explained in the ALJ decision, until June 2005, Shannon "had no reason not to pursue treatment if her conditions were as severe as she alleges."  TR 19.  The ALJ's decision further states that although Shannon has a history of Hepatitis C infection, and has polycystic kidneys with recurrent kidney stones, there is no medical evidence of current disabilities caused by Hepatitis C, and no evidence of significant kidney disease complications, such as renal failure or debilitating back pain, arising from polycystic kidney disease and kidney stones.  The ALJ noted that to the extent Shannon was using a cane, it was not based on a medical determination that a cane was needed, but rather Shannon's choice to begin using a cane.  Contrary to Shannon's self-reports, the ALJ concluded Shannon remains able to understand, remember and carry out at least simple instructions, as evidenced by her ability to drive a car, go to the grocery store, take her husband to the doctor, and perform the essentially full-time job of supervising her disabled husband and his home care. As to Shannon's complaint that she was unable to lift, the ALJ noted any lifting restrictions were based on Shannon's complaints and not medical testing.

In support of his conclusion that Shannon remains able to work despite her statements to the contrary, the ALJ also cited to Shannon's GAF score of at least 50 even without treatment, Shannon's poor work record, and Shannon's self-report of bipolar disorder with no supporting medical evidence.  Shannon claims the ALJ erred

by misinterpreting the GAF score and failing to fully develop the medical and work record.

        a.     Interpretation of the GAF score.

Based on the evidence of record, Shannon's GAF score was in a range of 50 to 60 during 2005. TR 217. A GAF of 51 through 60 is characterized by: 1) moderate symptoms including, for example, flat affect, circumstantial speech, and occasional panic attacks, or 2) moderate difficulty in social, occupational, or school functioning, such as having few friends, and having conflicts with peers or coworkers. See, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. 2000)("DSM-IV-TR"). A GAF of 41 to 50 is characterized by "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. Shannon claims a GAF of 50 evidences severe symptoms incompatible with maintaining employment, and therefore the ALJ misinterpreted the mental health evidence and erred when she concluded a person with a GAF of 50 is not disabled.

Shannon argues, "Where an ALJ makes up a psychological scale, reversal will follow." Filing No. 18, at p. 6. However, the ALJ's decision was not based on her personal interpretation of what a GAF score of 50 means, but on the evidence of record and opinions of the evaluating mental health providers. Clinical psychologist Lisa Jones, Ph.D. evaluated Shannon and diagnosed, "Current GAF equal to 50, highest past year equal to 60." TR 217. Based on Dr. Jones' report and Shannon's records, clinical psychologist Patricia Newman, Ph.D. concluded Shannon "is capable of doing simple unskilled work that does not require a great amount of public contact." TR 115. The ALJ relied on the reports of mental health professionals, and not her own personal interpretation of the GAF score, and did not contradict recognized standards for interpreting GAF scores when concluding Shannon's "Global Assessment of

-22-

Functioning of at least 50 indicat[es] an ability to work even without treatment." TR 19. See, e.g., Halverson v. Astrue, 2010 WL 1253736 at *4 (affirming the ALJ's finding that the claimant was able to work where the ALJ discounted claimant's GAF of 40 found by one provider and credited her numerous GAF scores between 50-60); Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)(holding a GAF of 58 is inconsistent with the treating physician's finding of extreme limitations); Vester v. Barnhart, 416 F.3d 886, (8th Cir. 2005(affirming ALJ's adverse decision where the claimant's GAF was 55 to 60); Willard v. Barnhart, 24 Fed. Appx. 642, 644, 2001 WL 1549543, 1 (8th Cir. 2001)(affirming the ALJ's adverse decision where the claimant's GAF scores were 50 or higher during the previous year).

    b.    The work record.

The ALJ concluded Shannon "has a poor work record and she does not appear to be an individual who has ever been motivated to obtain or maintain employment which does not lend to her credibility." TR 19. Shannon claims the ALJ erred because there is "no evidence to support her attribution of that [work] history to a lack of motivation." Filing No. 18, at p. 12. Shannon admits the dates and amounts of Shannon's paid work are not in dispute, (id.), but claims the ALJ should have considered whether Shannon's mental health symptoms resulted in her poor and intermittent work history. Citing to the mental and medical records filed on judicial review, Shannon claims that since the ALJ failed to collect and consider these records, she lacked any basis for attributing Shannon's work history to laziness. The court specifically notes the ALJ never stated Shannon was lazy. Rather, she concluded Shannon was not motivated to obtain or maintain a wage-paying job.

Shannon did not attempt to work until 1997. Even if the court considers the medical records now before the court, (filing no. 19), these records indicate Shannon received mental health care between 1991 through 1993, but refused to complete the inpatient treatment recommended by her doctors and went home. Filing No. 19. Had

these records been reviewed by the ALJ, they would not have supported a claim that Shannon was willing but unable to work due to mental health issues, particularly since there are no records of any mental health treatment between 1993 and Shannon's first attempt at employment in 1997.

To the extent Shannon has a work history, it was accumulated while Shannon was still on Medicaid, and therefore during a time when she was not seeking or obtaining care which was accessible even in the absence of insurance.  The evidence of record further verifies that while Shannon was foregoing available mental health care, she was raising five children and caring for her husband instead of obtaining gainful employment.  From these facts, the ALJ could reasonably infer that Shannon's lack of gainful employment was not based on her alleged impaired mental health status, and was instead motivated by her interest in staying home.

 c. Prescription for a cane.

Shannon claims the ALJ's credibility assessment was flawed because the ALJ noted Shannon was never prescribed a cane for walking.  The ALJ did not decide, and did not need to decide whether Shannon needed a cane.  The decision's reference to the use of a cane was raised in discussing Shannon's credibility.  The ALJ was entitled to infer that since a cane was never prescribed by any physician, no physician apparently believed Shannon's limitations warranted such a prescription.  This inference can properly be considered in assessing Shannon subjective claims and her credibility.

 d. Diagnosis of bipolar disorder.

As one of her grounds for concluding Shannon was not fully credible, the ALJ noted the lack of any actual medical diagnosis of bipolar disorder by a treating physician.  However, the supplemental medical evidence filed before this court

-24-

indicates Shannon  was diagnosed with bipolar disorder while hospitalized at Great Plains RMC during the 1991 to 1993 time frame.  Filing No. [19].

Although the ALJ mentions the lack of any diagnosis of bipolar disorder, as previously discussed, the credibility assessment was based on several factors.  Had the ALJ's decision made no reference to Shannon's self-report of bipolar disorder in assessing Shannon's credibility, there would nonetheless be a sufficient explanation in the decision, fully supported by the record as a whole, for concluding Shannon was exaggerating her symptoms.  There is no showing the ALJ would likely reverse her decision and now conclude Shannon was fully credible because the additional records now before the court confirm Shannon was diagnosed with bipolar disorder over a decade before she filed for disability benefits, and before she ever attempted to earn wages.  Shannon has failed to show the credibility assessment would have been different had the ALJ considered the 1991 through 1993 medical records produced to the court on judicial review.  Filing No. [19].

> 2.     Disorders, Limitations, and Medical Records not Considered.

Shannon claims the VE's testimony cannot provide substantial evidence to support the denial of benefits because the hypothetical question posed to the VE did not include all of Shannon's impairments and their consequences.  Specifically, Shannon claims the ALJ failed to develop the record related to Shannon's mental health problems in the early 1990s, failed to consider Shannon's history of bipolar disorder, obesity, and Hepatitis C infection, and failed to include Shannon's marked communication limitations in the hypothetical question posed to the VE.

> a.     Bipolar Disorder–1991 to 1993 Records.

Shannon claims that since the ALJ failed to gather medical records of Shannon's  hospitalizations and diagnosis of bipolar disorder in the early 1990s, the

ALJ could not fully consider Shannon's mental limitations in determining the extent of disability.

Hospitalization records dating back to the 1991 to 1993 time frame are of limited value in assessing Shannon's current mental health condition, particularly where her ongoing limitations were recently evaluated by consulting examiners. A diagnosis of bipolar disorder does not, in and of itself, mandate a finding of disability for social security purposes. The critical inquiry is to what degree the bipolar disorder disrupts the claimant's ability to function and obtain and maintain a job. Roberson v. Astrue, 481 F.3d 1020, 1024 (8th Cir. 2007). The record includes evidence of Shannon's limitations provided by consultants who, for the purpose of rendering opinions on Shannon's claim, assumed she was diagnosed with bipolar disorder, (see TR 217, 228), and the ALJ relied on these experts in determining the extent of Shannon's impairments. Under such circumstances, Shannon was not prejudiced by the ALJ's failure to collect records dating back to the 1991 to 1993 time frame. The ALJ's hypothetical question to the VE included limitations attributed to Shannon's mental impairments, and this case need not be remanded for further consideration of the 1991 to 1993 records.

    b.    Obesity.

Shannon claims the ALJ failed to consider her obesity in assessing her limitations. Although the physicians noted Shannon was obese and that her back and leg pain was likely caused, in part, by her obesity, there is nothing of record indicating Shannon has additional work-related limitations due to obesity alone. Under such circumstances, the ALJ's failure to further discuss obesity as an impairment does not provide grounds for reversal. See Forte v. Barnhart, 377 F.3d 892, 896-97 (8th Cir. 2004).

  c.  Hepatitis C.

  There is no evidence of record indicating current symptoms or work limitations attributable to Shannon's past history of Hepatitis C infection.  The ALJ did not err in failing to consider symptoms or sequella of a past Hepatitis C infection when determining Shannon's limitations.

  d.  Communication limitations.

  Shannon claims the ALJ failed to consider Shannon's marked inability to interact appropriately with the public, supervisors, and co-workers.  See TR 230. These marked limitations were documented in the psychological report of Brad Bigelow, Ph.D. based on Shannon's self-report during her clinical interview.  TR 231. The ALJ properly assessed Shannon's credibility and based on that assessment, concluded Shannon's self-reports of symptoms are exaggerated.  She was not required to accept those same self-reports as true and include them within the hypothetical question posed to the VE merely because the complaints were conveyed to Dr. Bigelow during the psychological evaluation.

  B.  Erroneous and Unsupported Assessment of the Available Job Market.

  Upon review of Shannon's records and testimony, the ALJ concluded Shannon can lift and carry up to 10 pounds, is limited to a 2- to 3-hour workday, can sit for 5 to 6 hours a day, and can occasionally climb, balance, stoop, kneel, crouch, and crawl, but she needs routine, repetitive work which does not require setting goals or dealing with change, and she must be limited to brief, superficial contact with the general public, co-workers, and supervisors.  The ALJ further concluded Shannon cannot work on ladders or scaffolds, and needs to avoid concentrated exposure to vibrations, fumes, and hazards.  TR 16.  The limitations described in the ALJ's question are supported by the record as a whole.

The VE testified Shannon could not return to her past employment if she had the foregoing restrictions and limitations. The VE testified, however, that Shannon could perform the job of Office Helper (DOT 239.567-010); Assembler, Production (DOT 706.687-010), or Packager, Hand (DOT 920.587-018). Assuming Shannon could perform these identified jobs, the VE's testimony concerning the number of such jobs existing in the regional and national economy justified the ALJ's decision to deny Shannon's disability claim.

However, the DOT describes Office Helper and Assembler, Production jobs as "light work," which requires:

> Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work.

239.567-010 Office Helper; 706.687-010 Assembler, Production. The job of Packager, Hand, is described in the DOT as "Medium work," which requires:

> Exerting 20 to 50 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or 10 to 25 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or greater than negligible up to 10 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Light Work.

920.587-018 Packager, Hand.

-28-

The VE did not explain, and the ALJ did not ask how a person limited to sedentary work with a 10-pound lifting and carrying restriction could perform any of the identified jobs, all of which are described by the DOT as requiring physical abilities that exceed Shannon's limitations.

SSR 00-4p states:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4p ("Resolving Conflicts in Occupational Information"). See also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003)("[A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications. . . .").

The ALJ's decision must explain how any conflict between the VE's testimony and the DOT job description was resolved. SSR 00-4p ("Explaining the Resolution"). In resolving the conflict, the ALJ may consider whether the VE possesses information not listed in the DOT about a specific job. "DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."  Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)(citing

Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997). These descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." Id. The DOT's definition of an "occupation" is a collective description of numerous jobs, and information "about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." SSR 00- 4p. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Wheeler, 224 F.3d at 897.

No testimony was elicited, and the ALJ's decision makes no attempt to explain the discrepancy between restricting Shannon to sedentary work and the VE's testimony that Shannon can perform jobs described in the DOT as light or medium work. The ALJ's decision must be reversed and remanded for further consideration on this issue. See also, Flesner v. Social Security Administration, 4:06-cv-03010, filing no. 13 (D. Neb. Aug. 31, 2006)(Kopf, J.),

Finally, the ALJ's decision states Shannon can work only a 2- to 3-hour workday. The hypothetical question posed to the VE did not include this limitation, and it is uncertain whether a 2- to 3-hour workday could lead to substantial gainful employment.

It is likely the reference to a 2- to 3-hour workday is a typographical error in the ALJ's written decision, but since this case is being reversed, the court will not address how this possible typographical error impacts the court's decision on judicial review. The length of workday issue can and will be left to the Commissioner's determination and clarification on remand.

## VII.  CONCLUSION

For the reasons stated, the court finds that the Commissioner's decision is not supported by substantial evidence on the record as a whole and is contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed, and the cause is remanded for further proceedings because:  (1) the ALJ failed to fully assess and explain whether, and reconcile how, Shannon can perform jobs identified by the vocational expert which, based on their DOT descriptions, exceed Shannon's residual functional capacity; and 2) the ALJ failed to explain Shannon's 2- to 3-hour workday limitation and failed to assess whether performing the jobs identified by the vocational expert for two to three hours a day could result in substantial gainful employment. The other issues raised in this appeal lack merit and are denied.  Judgment will be entered by separate document.

Dated this 13th day of April, 2010.

BY THE COURT:

*Richard G. Kopf*
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.